(Not for publication)

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

_____

DACIE ANGELO-CABALLERO,

                    Plaintiff,                Civil No. 05-3537 (RBK)

       v.

JO ANNE B. BARNHART,
Commissioner of Social Security Administration,

                   Defendant.

_____

## OPINION

**KUGLER**, United States District Judge:

    This matter comes before the Court upon appeal by Plaintiff Dacie Angelo-Caballero ("Angelo-Caballero"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  For the reasons set forth below, the decision of the Commissioner will be affirmed.

## I.  Factual Background

    Angelo-Cabellero, a forty-eight year old woman, alleges that she is disabled with an onset date of January 1, 2002, due to major depressive disorder, affective disorder, and vasculitis/mixed connective tissue disease. (Rec. 47-50, 345-47.)  She has completed her GED (General Equivalence Degree) and, therefore, has a high school education. (Rec. 19, 59.)  Her

1

most recent work was as a medical assistant. (Rec. 54.)

**A. Physical and Mental Ailments**

1.  Blood, Bone and Joint Issues

In January 2002, Dr. David A. Begleitter, M.D. performed MRI scans on Angelo-Caballero's cervical spine and shoulders. (Rec. 95-98.)  Dr. Begleitter stated that the MRI scans revealed tendinosis and possible bursitus in the left shoulder (Rec. 95); a small tendon tear, possible bursitus, and degenerative joint changes in the right shoulder (Rec. 96); and small disc herniation, dessication, and bulging of the spine. (Rec. 98.)

Later that month, Angelo-Caballero sought treatment from orthopedist Dr. W. Scott Williams for pain in her cervical spine and shoulders. (Rec. 135.)  Dr. Williams noted restricted motion in both shoulders but intact strength. (Id.)  He recommended aqua therapy and also referred Angelo-Caballero to Dr. Stephen Soloway. (Rec. 135, 136.)  Dr. Williams continued to see Angelo-Caballero through June 2002 but determined that she did not have a primary problem that could be treated orthopedically. (Rec. 139.)

A full-body bone scan of Angelo-Caballero from March 2002 revealed evidence of (1) mild osteoarthritis in the left elbow and lumbosacral spine, (2) possible fracture of the right ankle, and (3) probable plantar fasciitis in the left foot, but was otherwise negative. (Rec. 115-16.)

Dr. Begleitter performed an MRI on Angelo-Caballero's thoracic spine on June 7, 2002 and found non-specific lesions at T1, T6, T8, and T12. (Rec. 292.)  He noted that the possibility of early metastic disease or multiple myeloma could not be excluded, and he recommended a follow-up bone scan with clinical findings. (Id.)  The next month Dr. Mark Fisher evaluated

Angelo-Caballero and found "no chest pain, cough, shortness of breath, mouth ulcers, fevers, rashes, hair loss, Raynaud's or photosensitivity." (Rec. 167.)  In addition, Dr. Fisher found "good mobility in the upper and lower extremities." (Id.)

In May 2002, Dr. Rama R. Sudhindra, M.D. found that Angelo-Cabellero had clonal protein abnormality. (Rec. at 148.)  However, a bone marrow biopsy came back negative, and in July 2002, Dr. Sudhindra concluded "from a hematological standpoint, we have not demonstrated any evidence of lymphoma." (Rec. 145.)  Later that month, Dr. Sudhindra determined that there was evidence of monoclonal gammopathy, but no evidence of plasma cell dyscrasia. (Rec. 152.)

Nephrologist Gerald Herskovits, M.D. examined Angelo-Caballero in August 2002 after increased levels of protein were found in her urine. (Rec. 210.)  Dr. Herskovits determined that a renal biopsy would not be helpful and prescribed Altace for renal protection and elevated blood pressure. (Rec. 211.)  Dr. Soloway later requested a renal biopsy, but the record does not contain any evidence that such a biopsy was ever performed. (Rec. 215.)  In a follow-up visit in October 2002, Dr. Herskovits noted that Angelo-Caballero's lab results were normal, but she reported more pain and stiffness. (Rec. 214.)

In December 2002, Angelo-Caballero sought treatment at the Center for Pain Management ("the Center").  Dr. Barry A. Korn, D.O. evaluated Angelo-Caballero and had the following clinical impressions: (1) cervical, thoracic, lumbar, supraspinatus myofascial pain syndrome; (2) cervical herniated nucleus pulposus by history; (3) upper extremity and lower extremity paresthesias; and (4) history of collagen vascular disease. (Rec. 195.)  He recommended trigger point injections, Fluoromethane spray and stretch technique, and percutaneous neuromodulation therapy (PNT). (Id.)  Angelo-Caballero continued to visit the

3

Center through June 2003 and reported in May 2003 that trigger point injections and PNT "really help[ed]" with the pain. (Rec. 315.)

However, in January 2004, Angelo-Caballero fell down the stairs and suffered a "nondisplaced radial head fracture" of her left elbow. (Rec. 338.)  In April of that year, Dr. Silver, a physician at the South Jersey Center for Orthopedics & Sports Medicine, noted that radiographs showed the fracture had healed and that, although there was some pain and limited range of motion, pronation and supination were good. (Id.)  The report also noted that "the patient had some difficulty lifting heavy objects. . ." (Id.)

Several months later, in June 2004, Dr. Ralph Dauito, M.D. performed an MRI of Angelo-Caballero's brain. The MRI revealed no intracranial hemorrhage, acute infarction, or mass effect. (Rec. 337.)  There were some small foci of increased signal intensity within the periventricular white matter, but the remainder of the exam was unremarkable. (Id.)

### 2.  Depression

In March 2002, Angelo-Caballero first visited Dr. Stephen Soloway, M.D., whom she continued to see through July 2003.  In the initial exam, Dr. Soloway's impressions of Angelo-Caballero's symptoms were "pain amplification syndrome" with a "component of depression." (Rec. 333.)  He noted that she cried throughout the entire interview. (Id.)

Karen Davenport, Ph.D. examined Angelo-Caballero in November 2002 and noted her "affect was clearly depressed and tearful throughout the evaluation" but added that "cognitive functioning appeared average." (Rec. 190.)  Dr. Davenport reported that Angelo-Caballero could bathe and dress herself, pay the family bills, and generally tried to cook, clean, and do laundry. (Rec. 191.)  Dr. Davenport diagnosed Angelo-Caballero with major depressive disorder,

4

moderate to severe without psychotic features, and panic disorder without agoraphobia. (Id.)  Dr. Davenport found Angelo-Caballero's prognosis fair and stated this could improve with aggressive intervention. (Rec. 192.)

In January 2003, S. Flaherty, Ph.D., a Disability Determination Services doctor, completed a Psychiatric Review Technique Form and Mental Capacity Assessment pertaining to Angelo-Caballero's condition.  In that review, Dr. Flaherty found that, despite Angelo-Caballero's tearfulness and depression, her attention, concentration, and memory were only mildly impaired. (Rec. 209.)  In particular, the assessing doctor stated that "at the mental status exam [Angelo-Caballero] did very well despite depression [and] tearfulness throughout. Attention, concentration [and] memory were only mildly impaired. Communication was good [and] social skills adequate." (Id.)

In another mental evaluation at the Cumberland County Guidance Center, Dr. Balita diagnosed Angelo-Caballero with posttraumatic stress disorder and dysthymia and prescribed Lexapro and Effexor. (Rec. 223, 221.)

However, in follow up visits, Angelo-Cabellero's condition appeared to be improving. For instance, Dr. Herskovits saw Angelo-Caballero again on January 15, 2003 and noted "[s]ince I last saw her, she is feeling much better.  She has decreased aches and pains. Her mental outlook is so much better." (Rec. 216.)  Likewise, in a "follow-up evaluation" on March 17, 2003, Dr. Pendino noted his impressions of Angelo-Caballero, which included cervical/thoracic/lumbar myofascial pain syndrome, posttraumatic syndrome (clinically improving), history of depression/fibromyalgia, and migraine headaches (stable). (Rec. 295.)  He also noted "her clinical symptoms appear improving." (Id.)

### 3.  Vasculitic Rash

In June 2002, Dr. Bhendwal sent Angelo-Caballero to Dr. Soloway's office for evaluation of a possible vasculitic rash. (Rec. 150).  Dr. Soloway prescribed 60 mg of Prednisone daily to control the rash. (Id.)

The next month, Dr. Soloway noted Angelo-Caballero was "100% better" and "feeling well." (Rec. 149.)  He further noted that the vasculitic rash was no longer present and reduced the amount of Prednisone. (Id.)

By the following month, Angelo-Caballero reported no pain or rash to Dr. Soloway. (Rec. 183). Dr. Soloway's impression was of idiopathic vasculitis, but all of Angelo-Caballero's blood work was negative. (Id.)  He recommended weaning Angelo-Caballero off Prednisone. (Id.)  Two months later Gerald Herskovits, M.D. noted a rash under both breasts. (Rec. 214.)

Angelo-Caballero continued seeing Dr. Soloway through July 2003.  In February 2003, he noted that she had improved again with the use of Prednisone. (Rec. 322.)  In May 2003, he noted that "after cutting her Prednisone, the patient began feeling ill. All of her symptoms have returned . . ." (Rec. 320.)  Dr. Soloway increased her Prednisone, and by July 2003, he reported that "the patient is doing well at this time. She is tolerating her medications without difficulty." (Rec. 319.)

**B.  Residual Functional Capacity Assessment**

On March 26, 2003, Angelo-Caballero underwent a Physical Residual Functional Capacity Assessment ("RFCA").  The RFCA determined that Angelo-Caballero could stand or walk at least 2 hours in an 8-hour workday and could sit for about 6 hours in an 8-hour workday. (Rec. 300.)  The RFCA provided that Angelo-Caballero had limited ability to push and pull in

6

her upper extremities and noted that she should not reach overhead. (Rec. 301-02.)  In addition, the RFCA indicated that she should avoid concentrated exposure to extreme heat and cold, noise, fumes and odors, and avoid even moderate exposure to hazards. (Rec. 303.)

The examiner conducting the RFCA concluded that Angelo-Caballero suffered from the medically determinable impairments of vasculitis/mixed connective tissue disease, cervical DDD (degenerative disc disease), and shoulder tendinitis with partial right rotator cuff tear. (Rec. 304.) The examiner found that Angelo-Caballero's symptoms of whole body and joint pain were attributable to and proportionate to her ailments. (Id.)  However, the examiner also determined that Angelo-Caballero was improving over time and could maintain pace and persistence over an eight hour workday with certain limitations. (Id.)  The examiner additionally noted that there was no evidence in the record of fibromyalgia and no work-up for migraine headaches. (Rec. 306.)

In apparent contrast to the findings in the RFCA report, Dr. Munir Faswala, M.D., issued a one-page handwritten letter dated May 21, 2004, which is difficult to decipher, but which appears to state "[i]n my medical opinion [Angelo-Caballero] is unable to maintain any gainful occupation." (Rec. 344.)  Aside from this letter, the record does not appear to contain any other treatment notes from Dr. Faswala.

### C. New/Additional Evidence

After her hearing before the Administrative Law Judge ("ALJ") on September 15, 2004, Angelo-Caballero submitted additional medical records in support of her application for DIB and SSI.  The first "new" report was written by Dr. Gerald A. Falasca, M.D. on October 8, 2003 and it notes that Angelo-Caballero had a constellation of symptoms highly suggestive of lupus, but had negative work-ups in the past. (Rec. 356.)  The second report consists of a Lupus (SLE)

7

Residual Functional Capacity Questionnaire completed by Dr. Amy Evangelisto, M.D. and dated December 21, 2004. (Rec. 358-64.) Of particular note, the questionnaire indicates that the claimant is "incapable of even 'low stress' jobs." (Rec. 360.)  Finally, Angelo-Caballero also submitted records of her rheumatological history dating from February 27, 2004 through October 6, 2004. (Rec. 365-77.)

## II.  Procedural History

Angelo-Caballero filed applications for DIB and SSI payments on May 29, 2002.  In those applications, claimant alleged that she became unable to work on January 1, 2002 due to major depressive disorder, affective disorder, and vasculitis/mixed connective tissue disease. (Rec. 47-50; 345-48.)  The Social Security Administration ("SSA") initially denied her claim on May 7, 2003. (Rec. 40-45.)  The SSA denied Angelo-Caballero's request for rehearing on September 3, 2003. (Rec. 349-51.)

After Angelo-Caballero filed a timely notice of appeal, Administrative Law Judge ("ALJ") Christine McCafferty held a hearing on September 15, 2004. (Rec 378-99.)  Patricia Scott, an impartial certified vocational expert ("VE") also gave testimony at this hearing. (Id.) The ALJ issued a decision of denial on October 29, 2004. (Rec. 15-32.)

On June 10, 2005, the Appeals Council denied Angelo-Caballero's request for review. (Rec. 6-9). At that point, the ALJ's decision of October 29, 2004 became the final decision of the Commissioner of Social Security.  Thereafter, on July 15, 2005, Angelo-Caballero filed the present action before this Court.

## III.  The Commissioner's Decision

In ALJ McCafferty's October 29, 2004 decision, which was later adopted as the final

8

decision of the Commissioner of Social Security, she found that Angelo-Caballero was insured for benefits through the date of decision and had not engaged in any substantial activity since January 1, 2002. (Rec. 30.)  The ALJ further stated that Angelo-Caballero suffered from idiopathic vasculitis, degenerative joint disease, depression, and bilateral should syndrome; however, none of these impairments met or equaled the criteria of any listed impairment described in Appendix 1 of the Regulations. (Rec. 30-31.)  The ALJ found that Angelo-Caballero's statements regarding her limitations were not totally credible. (Rec. 31.)  The ALJ went on to state that although these impairments preclude Angelo-Caballero from returning to her previous employment, they do not preclude her from performing work that is available in significant numbers in the national and local economy. (Id.)  Accordingly, the ALJ concluded that Angelo-Caballero was not disabled at any time through the date of the decision. (Id.)

## IV.  Standard of Review

District Court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 301, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("Neither the district court nor this court is empowered to weigh the evidence or substitute its

conclusions for those of the fact-finder." (citing <u>Early v. Heckler</u>, 743 F.2d 1002, 1007 (3d Cir. 1984))).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. <u>Schonewolf v. Callahan</u>, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." (quoting <u>Gober v. Matthews</u>, 574 F.2d 772, 776 (3d Cir. 1978))).  Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." <u>Wallace v. Sec'y of Health & Human Services</u>, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting <u>Kent</u>, 710 F.2d 110, 114 (3d Cir. 1983)).

**V.  Discussion**

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; <u>Jones v. Barnhart</u>, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a).  Second, the

Commissioner  ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the Commissioner finds that the claimant's condition is severe, the analysis at step three requires the Commissioner to evaluate whether the condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues on to step four to evaluate the claimant's residual functional capacity ("RFC") and determine whether the RFC would entitle the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e).  The ability to return to past relevant work precludes a finding of disability.  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner at step five to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

        In this appeal, Angelo-Caballero challenges the Commissioner's decision on several grounds.  As an initial matter, she argues that the Court should remand the case and order the Commissioner to consider new evidence, which was submitted by Angelo-Caballero after the ALJ issued her decision.  In addition, Angelo-Caballero argues that the ALJ erred by (1) failing to consider medical impairment listings14.03 and 14.06, (2) failing to properly weigh evidence in the medical record, (3) failing to properly determine her residual functional capacity, and (4) failing, at step five of the analysis, to describe the specific job functions of a call out operator, alarm system monitor, or information clerk.  The Court will address these arguments in turn.

11

### A. "New and Material" Evidence

As a preliminary matter, Angelo-Caballero argues that this Court should remand the case and order the Commissioner to consider the medical reports of Dr. Evangelisto (dated December 21, 2004) and Dr. Falasca (dated October 8, 2003), as well as a series of progress notes regarding claimant's rheumatological history (dated February 27, 2004 through October 6, 2004).  Angelo-Caballero first presented these documents to the Appeals Council after the ALJ had closed the record and issued her decision of denial on October 29, 2004.  The Appeals Council added these documents to the record, but denied the claimant's request for review of the ALJ's decision. (Rec. 6-9.)

Pursuant to 42 U.S.C. § 405(g), a court may order the Commissioner to consider additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the Record in a prior proceeding. . ." 42 U.S.C. § 405(g).  In this regard, the standard for Appeals Council consideration of additional evidence is different than the standard for district court remand based upon additional evidence.  In particular, the relevant regulations permit the Appeals Council to consider "new and material" evidence that relates to the period on or before the ALJ's date of decision without requiring the Appeals Council to inquire as to whether claimant had good cause for failing to present the evidence to the ALJ. See Matthews v. Apfel, 239 F.3d 589, 592 (3d.Cir. 2001) (citing 20 C.F.R. § 404.970(b)).  Moreover, the Appeals Council can consider new and material evidence without granting the claimant's request for review. Id.  By contrast, the Social Security Act governs the standards for judicial review, and the above-quoted language of § 405(g) indicates that "when a claimant seeks to rely on evidence not presented to the ALJ, the

12

district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ." Id. at 593 (citing Keeton v. DHHS, 21 F.3d 1064, 1067 (11th Cir. 1994); Newhouse v. Heckler, 753 F.3d 283, 286 (3d Cir. 1985)).

Furthermore, the Third Circuit has elaborated upon the meaning and intent behind the "new," "material," and "good cause" requirements in § 405(g). See Scatorchia v. Comm'r of Social Sec., 137 Fed. Appx. 468, 472 (3d Cir. 2005); Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985); Szubak v. Sec'y of Health & Human Services, 745 F.2d 831, 833 (3d Cir. 1984). First, for the additional evidence to be new, it must be more than merely cumulative of the documentation already in the record. Szubak, 745 F.2d at 833. Second, to be material, the evidence must be relevant and probative. Id. The materiality prong also requires that there must be a reasonable probability that the new evidence would cause the Commissioner to reach a different conclusion. Id. In addition, the materiality inquiry implicitly requires that "the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id. (citing Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982)). Third, the claimant must demonstrate good cause as to why the evidence was not incorporated into the administrative record before the ALJ. Id. Without the good cause requirement, claimants would have an incentive to withhold evidence in the hopes of getting "another bite at the apple" in the event of an unfavorable decision. Cruz-Santos v. Callahan, No. Civ. A. 97-439, 1998 WL 175936, at *3 (D.N.J. Apr. 7, 1998) (citing Szubak, 745 F.2d at 834) (other citations omitted). In other words, requiring a showing of good cause ensures that motions for remand based on new

13

evidence do not become a perpetual "end-run method of appealing an adverse ruling by the Secretary."  Id. (citing Szubak, 745 F.2d at 834).

　　　With respect to Dr. Evangelisto's Lupus Residual Functional Capacity Questionnaire dated December 21, 2004, the claimant fails to satisfy the materiality requirements of § 405(g). Specifically, it appears that the Appeals Council should not have considered Dr. Evangelisto's report because it postdates the ALJ's October 29, 2004 decision and does not clearly relate back to the claimant's condition on or before that date. See 20 C.F.R. § 404.970(b) (stating that Appeals Council shall consider new and material evidence "*only* where it relates to the period on or before the date of the administrative law judge hearing decision") (emphasis added).  Dr. Evangelisto's questionnaire is dated December 21, 2004, and after "Nature, frequency, and length of contact" Dr. Evangelisto wrote "monthly office visits since 11/5/04." (Rec. 358).  In other words, Dr. Evangelisto did not complete the report until nearly two months after the ALJ issued her decision, and furthermore, Dr. Evangelisto's answers to the questionnaire all relate to observations she made of Angelo-Caballero's condition after the ALJ issued her decision of denial.  Therefore, because Dr. Evangelisto's questionnaire relates to a time period after the ALJ's date of decision, the document is immaterial to the ALJ's decision and thus, does not warrant remand. See Box v. Shalala, 52 F.3d 168, 171-72 (8th Cir. 1995) (finding that I.Q. test of claimant submitted to the Appeals Council postdated the ALJ's decision and therefore should not have been considered); Wilson v. Halter, No. Civ. A. 00-468, 2001 WL 410542, at *4 (E.D. Pa. Apr. 18, 2001) (finding that newly submitted evidence was not material, and therefore did not warrant remand, where the new evidence consisted of a doctor's reports which postdated the ALJ's decision by one to ten months).

14

Moreover, with respect to Dr. Falasca's report of October 8, 2003 and the rheumatology records from February 27, 2004 through October 6, 2004, the claimant has not shown "good cause" for the failure to present this evidence to the ALJ. See Matthews, 239 F.3d at 594; Torres v. Schweiker, 682 F.2d 109, 113 (3d Cir. 1982).  The only reason proffered for claimant's failure to present this evidence to the ALJ is that the claimant's prior counsel "obtained" the records "subsequent to the hearing." (Pl. Mem. at 10; Rec. 353.)  However, the claimant was represented by counsel at the administrative hearing and both Dr. Falasca's report and the rheumatology notes pre-date that hearing. See Cruz-Santos,1998 WL 175936, at *4-5 (finding that a mere allegation of a change in counsel, without more, does not constitute good cause for the failure to submit evidence to the ALJ).[1]  Moreover, the claimant offers no logical explanation as to why this evidence could not have been obtained prior to the administrative hearing. See id. at *3

---

[1] In Cruz-Santos, the court distinguishes the Szubak case. See Cruz-Santos, 1998 WL 175936, at *4 (distinguishing Szubak, 745 F.2d 831).  In Szubak, the claimant sought remand for consideration of newly submitted evidence.  The court found that the claimant met the good cause requirement because the ALJ's decision was substantially based upon an ambiguous report and the new evidence was offered to clarify that report. Szubak, 745 F.2d at 834.  The Szubak court ordered a remand because, under those particular circumstances, a remand "presented little danger of encouraging claimants to seek after-acquired evidence, and then use such evidence as an unsanctioned 'backdoor' means of appeal." Id.  However, the Cruz-Santos court noted that the justification for remand in Szubak did not apply to Cruz-Santos' situation. Cruz-Santos, 1998 WL 175936, at *4. As a preliminary matter, the district court in Cruz-Santo noted that the Szubak court did not clearly base its decision to remand on the fact that Szubak obtained new counsel after the ALJ's decision. Id. at *4 n.6.  Furthermore, unlike Szubak, the ALJ's decision in Cruz-Santos' case was not based upon an ambiguous report that the newly proffered evidence served to clarify. See id.  Therefore, the Cruz-Santos court distinguished Szubak and refused to remand the case because such a remand would "send a clear message that informal de facto appeals can be obtained by changing counsel and presenting evidence anew." Id. at *5.

In the present matter, the Court finds that this case is more akin to Cruz-Santos than Szubak because the only explanation given for Angelo-Caballero's failure to submit the additional evidence earlier is that "prior counsel obtained it subsequent to the hearing." Accordingly, the Court will not order a remand.

(noting that parties "must provide a logical reason why the proffered evidence was not, or could not have been, presented to the Secretary for inclusion in the record during the administrative proceedings"); Hoffman v. Shalala, No. Civ. A. 94-2473, 1995 WL 290442, at *4 (E.D. Pa. May 10, 1995) (noting that a claimant "cannot wait to obtain the information necessary to support [her] claim for benefits until after an adverse decision").  Accordingly, because Angelo-Caballero has not demonstrated "good cause" for her failure to provide the ALJ with Dr. Falasca's report and/or the rheumatology notes from February 27, 2004 to October 6, 2004, the Court will not remand the case for consideration of this newly submitted evidence.

### B.  Medical Listings 14.03 and 14.06

In addition to the request for remand based upon newly submitted evidence, Angelo-Caballero argues that the ALJ erred in not specifically considering the severe impairment listings 14.03 (systemic vasculitis) and 14.06 (undifferentiated connective tissue disorder).  However, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in the original).  In other words, the SSA "will not consider [an] impairment to be one listed in appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the findings shown in the Listing of that impairment." 20 C.F.R.  404.1525(d).  As the following analysis demonstrates, Angelo-Caballero does not meet all the criteria for either listing 14.03 or 14.06.  Therefore, because Angelo-Caballero's documented conditions could not satisfy all of the listing criteria for systemic vasculitis and/or undifferentiated connective tissue disorder, the ALJ did not err in failing to explicitly evaluate those listings in the October 29, 2004 decision of denial. See Jones v. Barnhart, 364 F.3d 501, 504 (3d Cir. 2004) (finding ALJ did not err in failing to metion a

16

specific listing impairment when it was clear that one of the criteria for that listing was not met).

First, with respect to the impairment listing for systematic vasculitis, the regulations require a diagnosis of vasculitis that is:

> Documented as described in 14.00B2,[2] including documentation by angiography or tissue biopsy, with:
>
> 1. A. Involvement of a single organ or body system, as described under the criteria in 14.02A.
>
> or
>
> B. Lesser involvement of two or more organs/body systems listed in 14.02A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organs/body systems must be involved to at least a moderate level of severity.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.03.  Here, Angelo-Caballero does not satisfy the documentation criteria as there is no record evidence of positive angiography or tissue biopsy. Angelo-Caballero's bone marrow biopsy was negative and, although Dr. Soloway requested a renal biopsy, there is no evidence that one was ever performed. (Rec. 155-60; 215.)  Therefore, in the absence of any record evidence of angiography or tissue biopsy confirming a diagnosis of systemic vasculitis, the ALJ properly found that Angelo-Caballero's idiopathic vasculitis did not satisfy the requisite criteria for an impairment listing.

Second, with regard to impairment listing 14.06, the regulations require a showing of undifferentiated connective tissue disorder that is "documented as described in 14.00B5, and with impairment as described under the criteria in 14.02A, 14.02B, or 14.04." 20 C.F.R. Pt. 404,

_____

[2]Section 14.00B2 provides in relevant part that a diagnosis of systemic vasculitis is "confirmed by angiography or tissue biopsy when the disease is suspected clinically.  Most patients who are stated to have this disease will have the results of the confirmatory angiogram or biopsy in their medical records." 20 C.F.R. Pt. 404, Subpt. P., App. 1, 14.00B2.

Subpt. P., App. 1, Listing 14.03.  In turn, section 14.00B states in relevant part:

> The documentation needed to establish the existence of a connective tissue disorder is medical history, physical examination, selected laboratory studies, appropriate medically acceptable imaging, and, in some instances, tissue biopsy. Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans. "Appropriate" means that the technique used is the proper one to support the evaluation and diagnosis of the impairment. However, the Social Security Administration will not purchase diagnostic tests or procedures that may involve significant risk, such as biopsies or angiograms. Generally, the existing medical evidence will contain this information . . . .

> 5. Undifferentiated connective tissue disorder (14.06)--This listing includes syndromes with clinical and immunologic features of several connective tissue disorders, but that do not satisfy the criteria for any of the disorders described; for instance, the individual may have clinical features of systemic lupus erythematosus and systemic vasculitis and the serologic findings of rheumatoid arthritis. It also includes overlap syndromes with clinical features of more than one established connective tissue disorder. For example, the individual may have features of both rheumatoid arthritis and scleroderma. The correct designation of this disorder is important for assessment of prognosis.

20 C.F.R. Pt. 404, Subpt. P., App. 1, 14.00B. Here, claimant has no medically acceptable imaging showing undifferentiated connective tissue disorder.  An MRI in January 2002 revealed tendinosis, bursitis, disc dessication, and disc bulging. (Rec. 95-98.)  A March 2002 bone scan revealed mild osteoarthritis. (Rec. 115.)  A June 2002 CT scan of the abdomen and pelvis revealed no joint disorders. (Rec. 134.)  That same month, an MRI revealed non-specific lesions on plaintiff's thoracic spine, but no evidence of connective tissue disorder. (Rec. 292.)  Therefore, based upon the lack of "medically acceptable imaging" evidence demonstrating a connective tissue disorder, the ALJ properly found that Angelo-Caballero's conditions did not meet all the criteria for any medical impairment listing, including 14.06.

In sum, although claimant points to diagnoses of severe immune impairments in the

18

record, she does not present record evidence that satisfies the required listing criteria for those severe impairments.  As a result, she is not considered to suffer from any of the foregoing listed impairments for SSA disability purposes.  See 20 C.F.R.  404.1525(d).  In her decision, the ALJ specifically recognized that Angelo-Caballero had diagnoses of "idiopathic vasculitis, degenerative joint disease, depression, and bilateral shoulder syndrome" but she also noted that "no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (Rec. 23, 24.)  Accordingly, the Court finds that the ALJ correctly determined at step three that Angelo-Caballero did not have any impairment that meets the criteria of the listed impairments described in the relevant regulations.

### C.  ALJ's Consideration of the Medical Evidence

As an additional or alternative argument, Angelo-Caballero contends that the ALJ failed to properly weigh the medical evidence in the record.  In particular, she argues that the ALJ did not consider the November 19, 2002 report of Karen Davenport, Ph.D.; the January 3, 2003 Psychiatric Review Technique Form and Mental Capacity Assessment; and treatment records from the Center for Pain Management from December 31, 2002 through June 5, 2003.  More generally, claimant also contends that the ALJ did not properly consider that some of claimant's doctors reported her depressive symptoms and prescribed antidepressants.

In terms of the ALJ's evaluation of the record evidence, the Third Circuit has stated "we need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." Cotter v. Harris,  642 F.2d 700, 705 (3d Cir. 1981).  However, more recently the Third Circuit indicated that "[a]lthough we do not expect the ALJ to make reference to every relevant treatment note in a case where the

claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law." Fargnoli, 247 F.3d at 42.  Here, although the ALJ did not specifically mention by name the documents that Angelo-Caballero highlights, the ALJ's decision comports with these findings and with the weight of the evidence on the whole.

### 1.  Evidence of Psychological Impairments

With respect to Angelo-Cabellero's psychological impairments, the ALJ made detailed findings.  First, the ALJ determined that Angelo-Caballero had moderate restriction in activities of daily living. (Rec. 23.)  In support of this finding, the ALJ noted the claimant's testimony that she helped take care of her children, cooked, and did some laundry and light housework. (Id.) Second, the ALJ found that the claimant had a mild degree of limitation in social functioning, noting that Angelo-Caballero had an attentive family consisting of her husband and two sons and she also had friends who transported her to where she needed to go. (Id.)  Third, the ALJ found that claimant had moderate impairment in maintaining "concentration, persistence, and pace" as she had slight problems maintaining attention "which involved falling asleep and migraine headaches." (Id.)  Finally, the ALJ determined that Angelo-Caballero had never experienced any "episodes of decompensation" as there was no evidence that claimant had repeated failures to adapt to stressful circumstances sufficient enough to cause her to withdraw or experience an increase in functional limitations. (See id.)  On the basis of these determinations, the ALJ concluded that Angelo-Caballero's psychological impairments were insufficient to satisfy the listing requirements for an affective disorder.

When compared to the ALJ's decision, the conclusions contained in the Psychiatric

Review Technique Form dated January 3, 2003 tend to support, rather than contradict, the ALJ's conclusions regarding Angelo-Caballero's mental state.  Like the ALJ's decision, the Psychiatric Review Technique found that the claimant had moderate restrictions in maintaining concentration, persistence, and pace and mild restrictions in social functioning. (Rec. 205.) Notably, the main difference between the two documents is that the Psychiatric Review Technique reports only mild restriction in activities of daily living, whereas the ALJ found that claimant had moderate restrictions in that area of functioning. (Rec. 205, 23.)  In other words, if anything, the ALJ apparently found that the claimant suffered from more psychological restrictions than the Psychiatric Review Technique indicated.

Likewise, the findings in the Mental Capacity Assessment from January 3, 2003 are consistent with the ALJ's discussion of claimant's psychological impairments. The Mental Capacity Assessment states that claimant was moderately limited in the ability to (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, (3) maintain regular attendance, (4) be punctual within customary tolerances, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms, and (6) perform at a consistent pace without an unreasonable number and length of rest periods. (Rec. 207.)  These findings appear to be consistent with the ALJ's conclusion that the claimant had moderate impairment in "activities of daily living" and moderate impairment in maintaining "concentration, persistence, and pace," which the ALJ defined as the "ability to sustain focused attention sufficiently long enough to permit timely completion of tasks commonly associated with a work setting." (Rec. 23.)  Furthermore, the doctor who performed the Mental Capacity Assessment also wrote that "at the mental status exam [Angelo-Caballero] did very well despite

depression [and] tearfulness throughout. Attention, concentration [and] memory were only mildly impaired. Communication was good [and] social skills adequate." (Rec. 209.)  This statement in conjunction with the above-listed findings of the assessing doctor reveal that claimant's concentration problems were mild to moderate and her communication and social skills were adequate.  These observations are virtually identical to the findings that the ALJ made in her decision. (See Rec. 23.)  Therefore, the Court is not persuaded by claimant's argument that the ALJ impermissibly disregarded or contradicted the findings in the Mental Capacity Assessment.

Similarly, the ALJ's decision comports with the findings of Dr. Davenport's November 19, 2002 report.  Dr. Davenport addressed Angelo-Caballero's restrictions in activities of daily living by noting that she was able to manage money, bathe herself with the use of a shower bar, clothe herself without difficulty, cook, do laundry, and drive. (Rec. 191.)  This is consistent with the ALJ's finding that the claimant could help take care of her children, cook, do laundry, and light cleaning. (Rec. 23.)  With regard to social functioning, Dr. Davenport's report states that claimant lives with her husband and son and has a few friends with whom she infrequently speaks. (Rec. 191.)  These observations are nearly identical to the ALJ's findings as to claimant's family and social life. (See id.)  Moreover, whereas the ALJ determined that Angelo-Caballero had moderate impairment in maintaining concentration, persistence, and pace, Dr. Davenport found that claimant's "attention and concentration" were only "mildly impaired." (Rec. 190.) That is, Dr. Davenport determined that Angelo-Caballero has even fewer restrictions maintaining concentration and pace than the ALJ recognized in her decision.  Finally, like the ALJ's decision, Dr. Davenport's evaluation did not contain any indication of episodes of decompensation. Thus,

22

on the whole, the ALJ's analysis of claimant's mental impairments is consistent with Dr. Davenport's observations.

The claimant also makes a general argument that the ALJ failed to consider that many of the claimant's doctors reported her depressive symptoms and some also prescribed antidepressants.  However, not only did the ALJ acknowledge that Angelo-Caballero exhibited symptoms of depression, she also acknowledged that Angelo-Caballero's impairments might meet some of the criteria in part "A" of Listing 12.04 regarding affective disorders. (Rec. 23.) Nevertheless, the ALJ found that even given these symptoms, there was no evidence that she also satisfied parts "B" or "C" of the listing. (Id.)  Thus, contrary to the claimant's assertion, the ALJ's decision indicates that the ALJ properly considered the medical evidence of Angelo-Caballero's depression.

### 2.  Evidence of Physical Impairments

Additionally, Angelo-Caballero argues that it was error for the ALJ to make no mention of the treatment records from the Center for Pain Management.  These records document findings of moderate paravertebral spasms with associated trigger point areas, positive jump signs with radiation of pain, and taut bands in the paravertebral musculature. (Rec. 193-96, 311-18). However, Angelo-Caballero's reports of neck and back pain are well documented throughout the entire record and the ALJ specifically found that she suffers from degenerative joint disease and bilateral shoulder syndrome. (Rec. 20). Moreover, the records from the Center for Pain Management seem to indicate that Angelo-Caballero's condition was improving with the treatment received.  The April 21, 2003 report states "patient reports headaches are a little improved." (Rec. 316.)  Similarly, the May 15, 2003 report states "[t]he patient reports that

23

trigger point injections and PNT really help with pain. . . . The patient reports 60% improvement in neck and low back pain with trigger point injections and PNT." (Rec. 315.)  These reports comport with the ALJ's determination that Angelo-Caballero's "condition has improved greatly and at a fairly steady pace." (Rec. 27.)  Therefore, although the ALJ does not specifically reference the records from the Center for Pain Management, her decision reflects the conditions and progress detailed in those records.

Finally, Angelo-Caballero argues that the ALJ erred in not considering the following statement of Dr. Munir Faswala, M.D.: "In my medical opinion patient is unable to maintain any gainful occupation." (Rec. 344.)  However, the ALJ did address this type of statement in her decision.  The ALJ noted,

> [S]tatements that a claimant is "disabled" , "unable to work", can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner. . .

(Rec. 26.) Although it may have been misleading for the ALJ to state that "[n]o doctor has ever stated or suggested that the claimant was disabled or totally incapacitated" (Rec. 26), the substantial weight of the evidence does not support Dr. Faswala's statement that Angelo-Caballero was unable to maintain gainful employment.  The March 26, 2003 RFC found that Angelo-Caballero was improving over time and could maintain pace and persistence over an eight hour workday with certain limitations. (Rec. 304)  Similarly, the January 2003 Psychiatric Review Technique Form found that her communication skills were good, social skills adequate, and memory, attention, and concentration were only mildly impaired. (Rec. 209.)  Moreover, because the record does not contain treatment notes from Dr. Faswala, it is unclear when and

how often he actually examined Angelo-Caballero.  As a result, in light of the contrary evidence in the record and the lack of treating records from Dr. Faswala to support his conclusory statement, the ALJ was not bound to give his conclusion controlling weight. See 20 C.F.R. §§ 404.1527(d), 404.1527(e)(3).

**D.  The ALJ's Analysis at Steps 4 and 5**

As additional points of contention, Angelo-Caballero claims that the ALJ erred both in determining the claimant's RFC and analyzing her ability to perform available work in the national economy. In particular, Angelo-Caballero argues that the ALJ did not specifically identify her functional limitations, both physical and mental, or assess her work-related abilities on a function-by-function basis pursuant to SSR 96-8P.  She also contends that the ALJ did not analyze her ability to regularly perform the full range of sedentary work, nor did she discuss the essential functions of a call out operator, alarm system monitor, or information clerk.

With respect to measuring Angelo-Caballero's physical limitations, the ALJ found that Angelo-Caballero retained the ability to perform sedentary work, restricted further by the limitations that she can only occasionally, climb, balance, bend, stoop, kneel, crouch, squat and crawl, and can never perform any overhead reaching. (Rec. 24). The ALJ added that "she is restricted to work that involves simple repetitive tasks." (Rec. 24). The ALJ then went on to cite the evidence for her conclusions, including the report of Dr. J. Gonzales-Alunna, the State Agency medical consultant; treatment records from Dr. W. Scott Williams, Angelo-Caballero's orthopedic specialist; and notes from Dr. Stephen Soloway, Angelo-Caballero's primary care physician. (Rec. 25). Thus, it seems clear that the ALJ did address Angelo-Caballero's physical, functional limitations and work-related abilities and specifically concluded that she is capable of

25

performing sedentary work with the foregoing, additional restrictions.

In addition, Angelo-Caballero submits that the ALJ did not adequately assess her mental abilities and limitations. However, the ALJ discussed Angelo-Caballero's mental abilities at length in determining that she did not satisfy severe impairment listing 12.04. (Rec. 23). The ALJ specifically mentioned that Angelo-Caballero suffered moderate impairment in her ability to sustain focused attention sufficiently long enough to permit timely completion of tasks commonly associated with a work setting. (Rec. 23). Moreover, as discussed above, the ALJ's analysis of the claimant's psychological functional limitations is consistent with much of the medical evidence in the record, including the Psychiatric Review Technique Form and Mental Capacity Assessment of January 2003, Dr. Davenport's report of November 19, 2002, as well as the claimant's own testimony. Accordingly, the ALJ did adequately address claimant's psychological functional limitations in a manner consistent with the medical evidence in the record.

Furthermore, the ALJ's analysis of claimant's functional limitations is wholly supported by the testimony of the VE at the administrative hearing. At the hearing, the VE testified that an individual with Angelo-Caballero's skills and limitations could perform work that was available nationally and locally in significant numbers. (Rec. 397-98.) The VE testified that an individual of claimant's age, education, and work experience who was able to perform sedentary work with occasional postural activity, limited to simple repetitive tasks, and no overhead reaching would be able to perform the sedentary unskilled duties of a call out operator, alarm system monitor, and information clerk. (Rec. 397). The VE further testified that all of these jobs were positions available in significant numbers nationally and locally. (Rec. 397.) More importantly, when

questioned by Angelo-Caballero's attorney, the VE stated that, in the above hypothetical, even if the individual had moderately limited working memory, mild restrictions maintaining social functioning, moderate difficulties maintaining concentration, persistence, and pace, and mild impairments of attention and concentration, that individual could perform the sedentary unskilled duties of a call out operator, alarm system monitor, and information clerk. (Rec. 397-98.)  Thus, the VE specifically found that an individual with all the characteristics of Angelo-Caballero would be able to perform work that existed in significant numbers in the national economy, and more specifically, that she could perform the duties of a call out operator, alarm system monitor, and information clerk. (Rec. 397-98.)  In other words, the ALJ's determination of Angelo-Caballero's RFC not only comports with much of the medical evidence in the record, but it also comports with the express findings of the VE.

Finally, Angelo-Caballero argues that the ALJ erred in step five of her analysis by not providing the specific job functions of a call out operator, alarm system monitor, and information clerk. Under the five step process,

> once the ALJ determine[s] plaintiff [does] not have the residual functional capacity to perform his past relevant work, the burden shift[s] to the Secretary to show that plaintiff possesses the capacity to perform other substantial gainful activity that exists in the national economy. To meet this burden, there must be a finding supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs. Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [plaintiff's] individual physical and mental impairments.

Varley v. Sec. of Health & Human Services, 820 F.2d 777, 779 (6th Cir. 1987) (citing

Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)) (other internal citations and quotation

marks omitted).  Here, as outlined above, the VE answered hypothetical questions that accurately

27

portrayed Angelo-Caballero's physical and mental impairments. (<u>See</u> Rec. 397-98.)  The VE noted that these impairments meant that someone with the claimant's impairments could perform sedentary unskilled work, such as the duties of a call out operator, alarm system monitor, and information clerk. (<u>Id.</u>)  Indeed, neither party challenges the accuracy of the VE's testimony or the hypothetical posed to her.  Moreover, the ALJ's decision not only references the VE's testimony, but it also specifically provides a definition of sedentary work and explains how the claimant's conditions create additional limitations that might diminish claimant's ability to perform the full range of sedentary work. (Rec. 24, 29-30.)  Thus, the ALJ's finding that Angelo-Caballero could perform the job functions of a call out operator, alarm system monitor, and information clerk stems directly from the VE's testimony and the regulatory framework, and therefore, is supported by substantial evidence. <u>Bembery v. Barnhart</u>, 142 Fed Appx. 588, 590 (3d Cir. 2005) (finding that the vocational expert's testimony that the claimant could perform unskilled light jobs such as "assembler, appointment clerk, or order clerk" constituted substantial evidence to support ALJ's determination at step five that claimant was not disabled and could perform those jobs); <u>Henry v. Barnhart</u>, 127 Fed. Appx. 605, 607 (3d Cir. 2005) (noting that vocational expert's unchallenged testimony that claimant had the capacity to work as a dispatcher, and that there were a significant number of dispatcher jobs, "makes the ALJ's decision supported by substantial evidence").  Accordingly, the Court finds that the ALJ did not err in step five of her analysis.

**VI. Conclusion**

Based on the foregoing analysis, the Court finds that the Commissioner's decision is supported by substantial evidence, and therefore, will be affirmed. The accompanying Order shall issue today.

Dated:   8/17/06                                s/ Robert B. Kugler
                                               ROBERT B. KUGLER
                                               United States District Judge